1
2
3
4                    UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF CALIFORNIA
6

7   P. C.,                              Case No.  20-cv-08107-JCS

                      Plaintiff,        **ORDER GRANTING PLAINTIFF'S**
8                                       **MOTION FOR SUMMARY**
                                        **JUDGMENT, DENYIMG**
9       v.                              **DEFENDANT'S MOTION FOR**
                                        **SUMMARY JUDGMENT AND**
10  KILOLO KIJAKAZI,                    **REMANDING FOR FURTHER**
                                        **PROCEEDINGS**
                      Defendant.
11
                                        Re: Dkt. Nos. 25, 29
12
13

14  **I.      INTRODUCTION**

15          On July 31, 2018, P.C.[1] applied for disability insurance benefits under Title II of the Social

16  Security Act, alleging disability beginning May 29, 2018.  The claim was denied both initially and

17  upon reconsideration, and E. Alis, an administrative law judge ("ALJ"), held a hearing on

18  February 21, 2020.  On April 30, 2020, the ALJ denied Plaintiff's application and on September

19  14, 2020, the Appeals Council denied Plaintiff's appeal of the ALJ's decision, making it the final

20  decision of the Defendant Commissioner of the Social Security Administration ("Commissioner").

21  After the Appeals Council denied review, Plaintiff sought review in this court pursuant to 42

22  U.S.C. § 405(g).  Presently before the Court are the parties' cross-motions for summary judgment.

23  For the reasons stated below, the Court GRANTS Plaintiff's Motion for Summary Judgment,

24  DENIES the Commissioner's Motion for Summary Judgment, and REMANDS for further

25  proceedings.[2]

26  ───────────────────

27  [1] Because opinions by the Court are more widely available than other filings and this Order
    contains potentially sensitive medical information, this Order refers to Plaintiff using only his
    initials.
28  [2] The parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C.

United States District Court
Northern District of California

## II.     FIVE-STEP REGULATORY FRAMEWORK

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is only found disabled if their physical or mental impairments are of such severity that they are not only unable to do their previous work but also "cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has established a sequential, five-part evaluation process to determine whether a claimant is disabled under the Social Security Act. *See Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. *Id.* "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Id.*

At step one, the ALJ considers whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in such activity, the ALJ determines that the claimant is not disabled, and the evaluation process stops. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ continues to step two. *See id.*

At step two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment" or combination of such impairments that meets the regulations' twelve-month durational requirement. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). An impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, disability benefits are denied. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ determines that one or more impairments are severe, the ALJ proceeds to the next step. *See id.*

_____

§ 636(c).

United States District Court
Northern District of California

At step three, the ALJ compares the medical severity of the claimant's impairments to a list of impairments that the Commissioner has determined are disabling ("Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If one or a combination of the claimant's impairments meets or equals the severity of a listed impairment, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the analysis continues. *See id.*

At step four, the ALJ must assess the claimant's residual functional capacity ("RFC") and past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The RFC is "the most [a claimant] can still do despite [that claimant's] limitations . . . based on all the relevant evidence in [that claimant's] case record." 20 C.F.R. § 404.1545(a)(1). The ALJ then determines whether, given the claimant's RFC, the claimant would be able to perform their past relevant work. 20 C.F.R. § 404.1520(a)(4). Past relevant work is "work that [a claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." 20 C.F.R. § 404.1560(b)(1). If the claimant is able to perform their past relevant work, then the ALJ finds that they are not disabled. If the claimant is unable to perform their past relevant work, then the ALJ proceeds to step five.

At step five, the Commissioner has the burden to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite [the claimant's] identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)). If the Commissioner meets this burden, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(f). Conversely, the claimant is disabled and entitled to benefits if there are not a significant number of jobs available in the national economy that the claimant can perform. *Id.*

## III.    BACKGROUND

### A.   Education, Work History, Drug and Alcohol Use

P.C. was a forty-five-year-old man at the time of his alleged onset date. Administrative Record ("AR") at 47. He grew up in Palo Alto, California and reportedly experienced abuse and neglect at the hands of his father, who, along with his brother and sister, abused substances. *Id.* at 314, 514. He dropped out of high school in the ninth grade but completed his GED in December

of 2000. *Id.* at 218, 315. At the time of the hearing, he lived in Oakland with four roommates. *Id.* at 514. He has been divorced, and has a history of arrests and incarceration, spending nine years in prison and one-and-a-half years in jail. *Id.* at 314. He also has a history of drug use, including heroin, cocaine, alcohol, nicotine, and marijuana, but testified at the hearing he had not used cocaine for four to six months, had not used heroin since May 2018, and had not drunk alcohol for two to three months. *Id.* at 40. He had, however, used marijuana one month prior to the hearing to try to relieve the "stress on [his] head." *Id.*

At the time of the administrative hearing, P.C. was employed by Command Center, a temporary agency, and was assigned to a car auction moving cars. *Id.* at 34-35. Previously, he had worked as a purchasing clerk (March 2016 to May 2018, 8 hours a day, 5 days a week); a construction worker (March 2013 to October 2013, 8 hours a day, 3 days a week); an on-call real estate sign poster (December 2012 to August 2013, 6 hours a day, 2 days a week); an on-call delivery driver (April 2012 to February 2013, 8 hours a day, 5 days a week); and an oil change/lube technician (January 2008 to February 2008, 8 hours a day, 5 days a week). *Id.* at 62, 218.

### B. Treatment History

P.C.'s physical impairments include peripheral neuropathy (which causes chronic pain in his feet and legs), essential hypertension, degenerative disc disease of the lumbar spine, diabetes mellitus, and obesity. *Id.* at 55. For these conditions, he takes multiple medications, including Atorvastatin and Simvastatin for cholesterol, Humalog and Metformin for diabetes, Lisinopril for his blood pressure, and Nortriptyline for nerve damage associated with his neuropathy. *Id.* at 220. Although the consultative examiner diagnosed P.C. with unspecified anxiety disorder and unspecified schizophrenia disorder, the record reflects that at least until shortly before the administrative hearing,[3] P.C. had not received treatment for his mental impairments or been prescribed psychotropic medications; nor had he been hospitalized for these impairments. *Id.* at

---

[3] At the hearing, P.C.'s attorney represented to the ALJ that P.C. had told him that he had started seeing a psychiatrist at Highland Hospital. *Id.* at 31. Although the ALJ apparently held the record open after the hearing to allow counsel to submit records in connection this treatment, it appears no such records were submitted.

515, 518. Thus, the treatment history summarized below relates only to P.C.'s physical impairments.

On February 5, 2015, P.C. was seen by Dr. Andrea Williams at Highland Hospital in Oakland, California. *Id.* at 392. Dr. Williams noted that P.C. had a "history of diabetes and diabetic neuropathy symptoms, but he report[ed] that over the last week he [had] had increased low back pain and pain in his right knee[,]" which he described as a "sharp, burning pain" that "radiate[d] from his back down to his legs." *Id.* Dr. Williams recommended the P.C. treat his pain with ibuprofen and heat and ice, and increased his dose of Neorontin (gabapentin). *Id.* at 394. She also referred him for spine and knee x-rays "to look at degenerative causes for this pain." *Id.* An x-ray of the lumbar spine performed the same day revealed stable mild degenerative disc disease at L5-S1. *Id.* at 392. The knee x-ray showed "[n]o fracture or significant degenerative change." *Id.*

A week later, on February 11, 2015, P.C. came in for a follow-up with Dr. Williams. *Id.* at 373. He continued to complain of low-back pain that radiated down his left leg. *Id.* He told Dr. Williams that the increased dose of Neurontin had not helped. *Id.* Dr. Williams again advised him to use "heat, ice, [and] anti-inflammatories" to "calm it down[,]" and prescribed Zanaflex (tizanidine) for muscle spasms. *Id.* at 374. She also referred him to Dr. Kim, an interventional pain doctor, for evaluation and treatment. *Id.* at 364, 374. That same day, P.C. went to the emergency department for his pain and was given a prescription for Norco. *Id.* at 362.

On February 27, 2015, P.C. returned to Highland Hospital, complaining of continued "severe lower back pain." *Id.* P.C. reported that the Norco helped with his pain more than the other pain medications and his prescription for Norco was renewed, with a quantity of tablets that would be sufficient to last until his scheduled appointment with Dr. Kim, in March. *Id.* At this appointment P.C. was also instructed to discontinue NovoLog for his diabetes mellitus and titrate up Lantus. *Id.* at 364. P.C.'s "problem list" from this visit also contained the notation "hypertension, not well controlled." *Id.* at 363.

P.C. returned for another follow-up on March 27, 2015, this time attended by Dr. Barooyr Zorthian. *Id.* at 355. Dr. Zorthian noted that P.C. had not yet been able to see Dr. Kim and that

United States District Court
Northern District of California

his appointment with Dr. Kim had been rescheduled for April.[4]  *Id.* P.C. reported at this visit that his back pain was "moderately controlled with Norco" but the treatment note describes the doctor's impression of P.C.'s back pain as "severe" and notes that P.C. also experienced "right leg sciatica and left plantar foot pain possibly secondary to tarsal tunnel syndrome." *Id.* Dr. Zorthian helped P.C. fill out an SSI application and "suggested [P.C.]'s disability will leave him unlikely to be ready to work prior to January 2, 2016." *Id.* at 356.

P.C. also returned to Highland Hospital several times over the next few months for issues unrelated to his back pain.  He was seen by Dr. Taft Bhuket on June 12, 2015 and again on November 11, 2015, in connection with his chronic Hepatitis B.  *Id.* at 337, 350.  Dr. Bhuket noted that testing results showed no indication for Hepatitis B viral treatment but recommended controlling the risk factors, such as P.C.'s diabetes, hypertension, and obesity.  *Id.* at 351.

P.C. was also seen by Dr. Swapnil Shah on November 5, 2015, for pain in his right hand related to multiple injuries he had sustained "punching other people." *Id.* at 341.

In April 2016, P.C. was seen by Dr. Bindu Desai at Highland Hospital.  *Id.* at 330.  According to the treatment note, P.C. was referred by Dr. Aristeo Lopez, of the Highland Wellness Adult Medicine Clinic ("Highland Wellness"). *Id.*  P.C. complained to Dr. Desai of left foot pain, which he claimed had been present since at least 2013.  *Id.*  The treatment note states that "[a]ll toes hurt with tingling and there is burning and it is worse when he walks or stands for a long period." *Id.*  The note states further that the Podiatry department thought P.C. might have tarsal tunnel syndrome and he had an EMG and nerve conduction done, which was done 10/2/2014, which states that the nerve conduction suggested a demyelinative type polyneuropathy affecting small myelinated fibers consistent with diabetic polyneuropathy and that the tarsal tunnel could not be diagnosed or excluded on the basis of the data." *Id.*  Dr. Desai's assessment was "[m]ost likely a digital neuropathy, which is unilateral" and "remains that way for 3–4 years secondary to diabetes."[5]  *Id.* He referred P.C. for another EMG nerve conduction study.  *Id.* at 332.

---

[4] It is not clear if P.C. ever saw Dr. Kim.  Although P.C. testified at the administrative hearing that Dr. Kim practiced at Highland Wellness, the Highland Hospital medical record do not contain any treatment notes from Dr. Kim.

[5] It is unclear if Dr. Desai intended to say that the condition had already existed for 3-4 years or if

The nerve conduction studies for the left sural sensory nerve, the left peroneal motor nerve and bilaterial tibeal motor nerve were normal. *Id.* at 325. The conduction study for the medial plantar sensory nerve was attempted but the results were not significant because there was no record of response on either side. *Id.*

On November 2, 2016, P.C. was seen at Highland Wellness by Dr. Aristeo Lopez[6] for hypertension and diabetes mellitus. *Id.* at 433. The treatment note also addressed P.C.'s neuropathy, which Dr. Lopez described as "stable" but noted that it was "not alleviated by much" and was "[w]orsened by walking [and] standing." *Id.* He noted, "Currently throbbing and tingling sensation." *Id.* Dr. Lopez added that he believed the neuropathy was "likely from small nerve fibers," which explained the normal results from the EMG study. *Id.* at 434.

The next medical record from Highland Hospital is dated July 3, 2018 and includes the notation "[h]as not been seen since 2016." *Id.* at 426.[7] On that date P.C. was seen by Heather Rowley, nurse practitioner, who noted, among other things, that P.C.'s diabetes has resulted in "blurry" vision and his hypertension was at goal. *Id.* She noted that P.C.'s neuropathy was "stable, on amitriptyline, has not noted any side effects." *Id.* She went to state, "Needs follow/up w/neurology. Not alleviated by much. Worsened by walking, standing. Currently throbbing and tingling sensation." *Id.*

On July 27, 2018, P.C. was seen by Dr. Julia Peterson at Highland Hospital in connection with his hypertension and diabetes. *Id.* at 412. Dr. Peterson noted that P.C. had been seen in the emergency room on July 18, 2019 for "L sided chest pain" which subsided on its own. *Id.* at 412. Dr. Peterson also noted that P.C. had experienced his first-ever loss-of-consciousness episode, which had been preceded by dizziness and lightheadedness. *Id.* She noted that P.C. had been experiencing "worsening fatigue and malaise for the past few weeks with increasing episodes of

---

it was likely to persist for another 3-4 years.
[6] In a July 28, 2016 treatment note, Dr. Lopez is listed as P.C.'s primary care physician. *Id.* at 324.
[7] It appears that during the interim P.C. may have been receiving care from Kaiser Permanente. *See id.* at 529-585, 588-593. There is a treatment note from May 10, 2018 from Malathi Acharya, M.D., who saw P.C. for his diabetes. *Id.* at 533. There is also a treatment note from June 4, 2018, when Dr. Acharya conducted a telephone visit to advise P.C. on his "leg swelling" and neuropathy. *Id.* at 532.

United States District Court
Northern District of California

lightheadedness, as well as poor appetite and increased stress at home." *Id.* P.C. also reported to Dr. Peterson that he recently quit heroin, had just started taking buprenorphine and was in withdrawal at the time. *Id.* In connection with P.C.'s diabetes, Dr. Peterson noted that P.C. reported "worsening" neuropathy in his feet and blurred vision. *Id.*

On August 21, 2018, P.C. was seen again by Dr. Peterson at Highland Wellness. *Id.* at 405. P.C. reported in connection with his diabetes mellitus that his insulin was "much better controlled since switching insulin from NPH to Lantus/Humalog." *Id.* On the other hand, he reported that his neuropathy had been "worse lately" and sometimes kept him up at night. *Id.* He reported that he could not stand for prolonged periods of time and that his neuropathy was keeping him from being able to work. *Id.* He reported that he felt that the Nortriptyline was no longer working and wanted to try Lyrica instead. *Id.* Dr. Peterson noted that P.C. reported he had not used heroine since his last visit and was not experiencing any withdrawal symptoms (though he had increased his tobacco usage due to increased stress). *Id.*

Dr. Peterson instructed that P.C. should "taper down" the Nortiptyline for three weeks and started P.C. on Lyrica. *Id.* at 405-406. At P.C.'s request, Dr. Peterson filled out a "general assistance form" for him. *Id.* Dr. Peterson found that P.C.'s neuropathy was "clinically worsening" and "debilitating[,]" noting that 2016 EMG results were within normal limits and opining that neuropathy was "likely small fiber [dorsal zone]." *Id.* She also found that P.C.'s hypertension was "not at goal" and recommended that P.C. return in one month to follow up. *Id.* at 406.

The next treatment record from Highland Wellness is dated May 17, 2019, when P.C. was seen by Heather Rowley, N.P. *Id.* at 499-505. (Rowley notes that P.C. was "last seen by this provider on 2/5/19," *id.* at 499, but treatment notes from that visit are not in the record.) N.P. Rowley noted in connection with P.C.'s diabetes that P.C. was "connected to CCC but routinely missing appointments" and that his last A1C test was on December 28, 2018. *Id.* She wrote that P.C. "[n]eeds follow up scheduled with CCC or warm hand off today if possible." *Id.* She wrote that with respect to hypertension, P.C. was "not on meds last visit due to ran out, here to recheck while on meds." *Id.* She noted that he was "above goal today." *Id.* P.C. also complained of low

back pain.  *Id.* at 499, 502.  N.P. Rowley wrote, "previous pain several years ago, and took muscle relaxants and it went away. Pt seen previously by Dr. Kim who offered him an injection, but he declined and pain went away on its own." *Id.* N.P. Rowley further noted that P.C. brought up chest pain "mid-visit" and that while he had been experiencing pain for approximately a week this was the "[f]irst time telling a provider."  *Id.*  at 499.  In light of his "very high risk, and symptoms sounding very typically cardiac" P.C. was sent to the emergency department for "asap labs and eval to rule out [acute coronary syndrome.]"  *Id*. at 500.

Treatment notes from the emergency department from the same date indicate P.C. complained of severe chest and lower back pain.  *Id.* at 480.  The pain in his chest had started one week prior, after he had participated in a basketball game, which was unusual for him given his normally sedentary routine.  *Id.*  He called the chest pain a "squeezing sensation" which radiated to his throat, and described his lower back pain as a "shooting sensation into the left lower extremity below the knee, which he has had long term."  *Id.*  P.C. rated his pain as a 10 out of 10. *Id.* Although P.C.'s initial EKG was "reassuring[,]" the attending physician concluded that inpatient stress testing was appropriate.  *Id.* at 481.  However, against medical advice, P.C. declined the recommended inpatient work-up, even though he was warned of the risk of death or permanent disability.  *Id.* at 481, 488.  Dr. Max Sobrero, M.D., one of the emergency department doctors who treated P.C., described P.C.'s diabetes and hypertension as "poorly controlled." *Id.* at 481.

## C.    Medical Opinions

### 1.    Dr. Diaz

Dr. Alex Diaz, M.D.,[8] opined on February 8, 2019 that P.C.'s ability to lift and carry were

---

[8] Plaintiff contends in his motion that "Dr. Diaz as a Highland practitioner had access to years of medical records, progress notes and opinions, in combination with his own professional experience evaluating and treating P.C." Plaintiff's Summary Judgment Motion at 6.  It is not apparent from the record, however, that Dr. Diaz is a Highland practitioner.  Nor does the record contain any records of treatment provided by Dr. Diaz.  The Commissioner does not take a position as to whether Dr. Diaz was, in fact, a Highland practitioner who treated P.C., but points out that "[t]here is no evidence in the record or indicated on the check-box form that Dr. Diaz treated Plaintiff or that he reviewed any medical records."  Commissioner's Motion for Summary Judgment at 11.

United States District Court
Northern District of California

1    severely impacted by his impairments, and he could only occasionally carry ten pounds and stand

2    for at most two hours out of an eight-hour workday.  *Id.* at 402.  Dr. Diaz also stated that P.C.

3    needed to sit for six hours out of the eight-hour workday, alternate standing and sitting, and take

4    more than the normally-scheduled allotment of breaks to manage his pain.  *Id.*  Dr. Diaz found that

5    P.C. could only occasionally (for up to one-third of the workday) climb, balance, stoop, kneel,

6    crouch, crawl, reach, finger, and feel.  *Id.* at 403.  Dr. Diaz did not cite supporting medical

7    findings for any of these limitations except the standing/walking and standing/sitting limitations;

8    as to those, he included notations that P.C. had "severe peripheral neuropathy."  *Id.*

9                    **2.   Consultative Examiner Dr. Eugene McMillan, MD**

10          Consultative examiner Eugene McMillan, MD, conducted an internal medicine evaluation

11   of P.C. on February 11, 2019.  *Id.* at 521-524.  He noted P.C.'s history of diabetes, hypertension

12   and neuropathy and noted that P.C. reported "tingling and throbbing of his feet and shooting pain

13   of his calves." *Id.*  at 521. Dr. McMillan reviewed some medical records, including records "from

14   three clinic visits from Highland Adult Medical Clinic dating from 7/03/2018 to 8/21/2018." *Id.* at

15   523. It does not appear that he reviewed the 2015-2016 Highland Hospital records summarized

16   above. Dr. McMillan noted that P.C. brought a cane to the appointment but based on his physical

17   examination of P.C. found that P.C. could "walk both forward and backwards without the use of

18   his cane." *Id.* at 523-524. Dr. McMillan found that P.C. had normal range of motion as to his

19   wrists, elbows, shoulders, hips, knees and ankles.  *Id.*  at 524.  With respect to P.C.'s functional

20   capacity, Dr. McMillan found that P.C. was "able to occasionally lift and carry 50 pounds and

21   frequently lift and carry 25 pounds." *Id.* at 524.  Dr. McMillan found that P.C. could stand and

22   walk for at least six hours during an eight-hour workday, with no limitations on sitting, seeing,

23   hearing, speaking, reaching in all directions, or gross or fine manipulations.  *Id.* He found that P.C.

24   could engage in activities that required stooping, kneeling, and crouching for up to one-third of the

25   workday.   He opined that P.C. did not require the use of a cane.  *Id.*

26                    **3.   Consultative Examiner Shephali Gupta, Psy. D.**

27          On January 9, 2019, consultative examiner Shephali Gupta, Psy. D., conducted a complete

28   psychological evaluation of P.C. and administered a number of tests of his intellectual functioning,

United States District Court
Northern District of California

including the Wechsler Adult Intelligence Scale – 4th Edition (WAIS–IV), the Wechsler Memory Scale – 4th Edition (WMS–IV), and the Trail Making Test (TMT).  *Id.* at 514.  Dr. Gupta noted that P.C. presented in a friendly manner, made good eye contact, and his facial expressions were appropriate to the information provided.  *Id.*  During the examination, P.C. reported first experiencing social anxiety and delusions after coming home from his last period of incarceration in 2005; he claimed that his current symptoms were worse and more persistent compared to when he first experienced them.  *Id.* at 515.  According to Dr. Gupta, P.C. reported that his mental health symptoms "do impact daily living."  *Id.*  She noted, however, that P.C. was "independent for basic [Activities of Daily Living] and does not need help with preparing meals, doing light household chores, dressing/bathing, hygiene, ambulating, eating, and toileting."  *Id.*  She also noted that P.C. was able to drive, pay bills, and keep track of money without help from other people. *Id.*  P.C. told Dr. Gupta that his typical day was to "[g]et up, shit, make something to eat, lay back down, watch TV all day. Same thing over and over again."  *Id.*

During the examination, Dr. Gupta noted that P.C.'s attention and concentration were good, as he was "able to count by 2s to 20 and back to zero" and to "complete a three-step command to place a hand on the opposite shoulder, close eyes, and put the other hand on the head."  *Id.*  His calculations were also intact: when asked how much change one would expect back from a one-dollar bill for an item that cost seventy-eight cents, P.C. responded "22."  *Id.*  His fund of information was fair, consistent with his background and education level.  *Id.*  His abstraction skills were also adequate; when asked how an orange and apple were similar, he responded "both are fruits," and when asked how they were different, he responded "one you peel and one you don't."  *Id.* at 516.  His memory was graded as adequate, as he was able to answer questions regarding the time of this examination appointment and his date of birth, as well as to recall three out of three words after a brief delay.  *Id.*

P.C. endorsed having delusions during this examination, stating that since he came home from prison in 2005, "the TV tells [him] what to eat and drink[]. The sound goes up and down. It responds to [him]."  *Id.*  He described his belief that, if he made a certain movement while watching the TV, it could mimic his movements.  *Id.*  He added, however, that he recognized he

"sound[ed] crazy talking about it." *Id.*  His affect was depressed, he spoke in short, concrete, excessively vague sentences, and while his mood was calm, he explained that this was only because he "got a ride from [his] roommate. If [he] had to take the bus, [he] woulda heard all sorts of crazy things and [he] woulda been irritated." *Id.*  When asked what made it difficult for him to maintain consistent employment, he stated the following: "Like I said I can't really, I can't socialize like that. Even with my roommates I'm kind of stand offish.  I get anxiety easily where I get sweaty easily. I can't remember easily what's next to do and stuff like that. I get somewhat angry, I don't know how to channel that emotion very well. I do verbally outbursts and stuff like that. You can't do that professionally you know what I mean." *Id.* Dr. Gupta opined that P.C. "appeared to respond to questions in an open and honest manner[,]" noting that 'there "did not appear to be any evidence of the claimant exaggerating symptoms, nor did there appear to be any inconsistencies throughout the evaluation." *Id.*  at 518.

Dr. Gupta's testing of P.C.'s intellectual functioning yielded results putting P.C. in the extremely low to average level of functioning.  *Id.* at 516–18.  On the WAIS–IV, his full-scale IQ measured 74, in the borderline range, with low average scores in processing speed and working memory, and borderline scores in verbal comprehension and perceptual reasoning. *Id.* at 516–17. On the WMS–IV, he scored average on his immediate memory, extremely low on his delayed memory, low average on his auditory memory, and borderline on his visual memory.  *Id.* at 517.

Based on the testing results and P.C.'s own reported symptoms, Dr. Gupta diagnosed him with Unspecified Anxiety Disorder and Unspecified Schizophrenia Disorder.  *Id.* at 518.  She found that he had no impairment in his ability to perform simple and repetitive tasks, a mild level of impairment in his ability to perform detailed and complex tasks, and a moderate level of impairment in his ability to interact with coworkers and the public, to perform work activities on a consistent basis without special or additional instruction, to maintain regular attendance in the workplace and complete a normal workday/workweek without interruptions from a psychiatric condition, and to deal with the usual stress encountered in the workplace.  *Id.* at 518-519.

### 4.  State Agency Practitioners' Record Review

Dr. I. Herman reviewed the record at the initial level and assessed P.C.'s physical residual

functional capacity.  *Id.* at 58-59. He found that P.C. did not have notable exertional limitations: according to Dr. Herman, P.C. could carry fifty pounds occasionally and twenty-five pounds frequently, could stand or walk for up to six hours out of an eight-hour workday, and had no postural or manipulative limitations.  *Id.* at 58.  Dr. J. Pham reviewed the record at the reconsideration level and agreed with the findings of Dr. Herman that P.C. had no notable limitations on his physical residual functional capacity.  *Id.* at 73.

State agency medical consultant Harvey Bilik, Psy.D., assessed P.C.'s mental residual functional capacity based on a review of the record at the initial level. *Id.* at 55-56.  Dr. Bilik found that P.C. had a mild impairment in his ability to understand, remember, and apply information, and moderate impairments in his ability to interact with others; to concentrate, persist, or maintain pace; and to adapt or manage himself.  *Id* at 56.  Dr. Bilik added that he believed there was a "mild–moderate range of severity for any ongoing functional limitations resulting from medical impairments alone."  *Id.*  He also stated that, in his opinion, P.C. could "understand and remember simple and detailed instructions" and could "carry out simple and detailed instructions over the course of a normal workweek despite any limitations in this domain."  *Id.* at 60–61.  In addition, P.C. could "interact appropriately with others, but may benefit from reduced interactions with the public."  *Id.* at 61.

Jennifer Ryan, Ph.D., another State agency medical consultant, reviewed the record at the reconsideration level and agreed with Dr. Bilik's findings.  *Id.* at 79.  She concluded that Dr. Bilik's initial findings were "supported by the evidence contained in the initial file," finding that "evidence continues to support limitations outlined above and the initial decision is considered persuasive."  *Id.*

### D.    P.C.'s Statements and Testimony

#### 1.    Adult Function Reports

##### a.    October 25, 2018 Adult Function Report

On an Adult Function Report dated October 25, 2018, P.C. reported that "chronic pain to both feet and legs" limited his ability to work.  *Id.* at 242.  He also asserted that he did not "work well with other people becuase [sic] of mind mental state [sic].  Major panic attacks or anxiety."

13

*Id.* Regarding his daily activities, he stated, "Wake up around noon or 1–2 PM. Make my bed and take shower. Eat if hungry or lay back down and watch T.V. or DVD movies all day." *Id.* at 243. In response to a question on the form asking what he was able to do before his alleged onset date that he could no longer do, P.C. wrote, "[g]o out in public & play sports. Run at will. Go to clubs and parties. Go to places where a lot of people would be." *Id.* He reported having no problems with personal care, such as grooming or bathing. *Id.* at 243–44.

P.C. wrote that he prepared his own meals daily, but sometimes needed to sit down to do so, and if his chronic pain affected him too much, he ate fast food instead. *Id.* at 244. He stated that he had no limitations in doing housework or yardwork, writing that he routinely made his bed, washed dishes, and swept and mopped as needed. *Id.* He reported that he left the house two to four times per week, stating that he did not do so more frequently because of "chronic pain to feet & legs & major anxiety & panic attacks." *Id.* at 245. P.C. reported that when going out, he traveled by walking, public transportation, or getting a ride with a friend, but did not drive himself as he did not own a car. *Id.* He did his own shopping in stores once or twice per month for one to two hours at a time, buying necessities and food. *Id.* He paid his own bills, and reported having the ability to count change, handle a savings account, and use a checkbook. *Id.* He did not have many hobbies, as he was "[n]ot interested in doing too much of anything other than watching movies on TV." *Id.* at 246. He noted that, since the onset of his conditions, the TV "influence[d] [him] into eating, drinking, smoking, etc." *Id.* He also reported spending little time socializing with others, though sometimes he chatted with his roommates or visited his sister. *Id.* He wrote that he needed someone to accompany him to the grocery store and to provide a ride to his sister's house "so that people [wouldn't] follow [him]." *Id.* He noted elsewhere on the form that he goes out less frequently than he used to due to his "chronic pain" and because "people like to follow [him]." *Id.* at 247.

On a check-box portion of the form, P.C. checked boxes indicating he had limitations that affect lifting, squatting, bending, standing, walking, talking, stair-climbing, seeing, memory, completing tasks, concentration, and getting along with others. *Id.* at 247. He wrote that he only had the ability to walk a quarter of a mile or less before needing to rest. *Id.* His wrote that his

ability to pay attention depended "on if [he was] looking at idiot shit that people do & say to get [his] attention." *Id.* He stated that he did not often finish what he started, but that his ability to follow instructions, both written and spoken, was good. *Id.* He described his ability to get along with authority figures as "ok I guess." *Id.* at 248. He claimed that he had been fired in the past for being "antisocial when it came to company events & because [he] felt unappreciated," but when prompted did not provide the name of the company that fired him for this reason. *Id.* In response to a question asking how well he handled stress, P.C. wrote, "I have panic attacks and anxiety." *Id.* at 248. P.C. left blank a question asking if he used any assistive devices, including a cane. *Id.* He listed seven medications he was taking at the time for his physical conditions. *Id.* at 249.

### b. May 9, 2019 Adult Function Report

P.C. filled out a second Adult Function Report on May 9, 2019. *Id.* at 276–283. His responses were similar to those in the previous report but appear to describe worsening symptoms. He complained not only of "chronic nerve damage to both feet and legs" but also "manic depression and stress." *Id.* at 276. Whereas he had previously answered "No" to the question asking if he needed reminders to take care of "personal needs and grooming[,]" *id.* at 244, he checked "Yes" in his second report, noting that he "get[s] distracted very easy." *Id.* at 278. Similarly, whereas he answered "No" in the first report in response to the question asking if he needed encouragement to do house and yard work, *id.* at 244, he checked "Yes" in the second report, with the notation "sometimes due to stress and depression." *Id.* at 278. He stated that his ability to handle money had also changed, stating, "because of anxiety and depression I spend more money on food." *Id.* at 280.

He checked boxes indicating that, when going out, he either rode in another's car or took public transportation, but this time left unchecked the box for "walking." *Id.* at 290. In three separate responses, he specified that he was no longer "interested in goin [sic] anywhere," a hermit [choosing] to be alone and isolated," and that "anxiety & depression [had him] alone." *Id.* at 280, 281. He also mentioned forgetting his appointments and needing someone else to accompany him around large crowds. *Id.* at 280.

Physically, he reported only being able to walk for two blocks before needing to rest for

ten to fifteen minutes. *Id.* at 281. On the check-box portion of the form, he noted limitations in lifting, squatting, bending, standing, walking, sitting, kneeling, hearing, stair-climbing, seeing, memory, completing tasks, concentration, following instructions, and getting along with others. *Id.* He stated that he used a cane "from time to time," though it was not prescribed by a doctor. *Id.* at 282.

### 2.  P.C.'s Testimony at the February 2020 Hearing

At the administrative hearing, on February 21, 2020, P.C. testified that he had been working for Command Center Temp Agency since November 2019, and his then-current assignment was for a car auction, for which he drove cars from location to location. *Id.* at 34. He testified that he was not required to lift anything at this job; he would merely get in the car and start it, occasionally jump starting it if it did not start. *Id.* at 35. He stated that he worked there no more than four days per week, four to eight hours per day. *Id.* He testified that before that, the last job he had held was with Vista University as a purchasing clerk, lifting heavy poles off trucks. *Id.* He said he was fired from that job in February 2018 for sleeping on the job, as he "wasn't regulating [his] glucose sugar level right." *Id.* at 36. When asked about performance issues at the car auction job, he stated that he had not heard directly from his manager, but they had "hinted," and he had "heard through certain people as far as [him] being lazy, sitting in the car" because he would "try to get sleep and try to lag around or park somewhere." *Id.*

The ALJ then questioned P.C. about his sleep habits. P.C. testified that he could not sleep much because he had roommates, "pests that rip and run, make noise, need attention, say this, do that." *Id.* at 37. He elaborated that he had difficulty getting along with other people due to "trust issues." *Id.* He testified that he heard "voices in [his] head, telepathic stuff through [his] TV." *Id.* He brought a remote to the hearing to show the ALJ that the TV speaks to him, and he mentioned that Kendrick Lamar would chant "text me" during his songs "if you listened very closely." *Id.* He testified that he heard voices in his head "every day all day" and there was nothing he could do about it, but he tried to suppress the voices as best he could. *Id.* As a result, he had frequent trouble focusing, claiming that his attention span was "very short" and that he could only read for "maybe 15–20 minutes at the most" because the voices in his head would "make [him] go left"

16

and "shut[] [him] down." *Id.* at 38.  He said he did not take medication for these voices because he was "reluctant to talk to [his] doctor," citing "trust issues." *Id.* at 41.

In response to questions about his physical impairments, P.C. stated that he could walk for "maybe 15–30 minutes" and then would need to rest for "5–10 minutes" because "[i]t burns. It's like walking on coal or hot fire. There are days where it's not bad and others when excruciating." *Id.* at 39.  In response to a question about whether he could lift or carry twenty-pound boxes, P.C. testified he could "have a problem" because he might tweak his back, and that his major back pain comes and goes. *Id.*  This problem, he stated, he had dealt with "since 2006 or so" and described the experience as shooting "pain all the way down [his] leg." *Id.*  He said that "it don't take much to throw that off" because he had a hernia. *Id.*  He testified that he had received treatment for the back pain from Dr. Kim at Wellness Center, but after refusing Novocain shots or surgery, the pain went away on its own. *Id.* at 40.  As for substance use, P.C. stated that he had not used cocaine for four to six months, had abstained from heroin since May 2018, had not drunk alcohol for two to three months, and had used marijuana "[m]aybe a month ago to clear the stress in [his] head." *Id.* at 41.

E.  **Vocational Expert Testimony**

At the hearing, the VE classified P.C.'s past work as:  1) Lube services, 915.687-018, SVP-4, medium; 2) Telephone directory distributor driver, 906.683-018, SVP-3, light; 3) Purchasing clerk, 249.367-066, SVP-4, sedentary, heavy as performed; and 4) Driver, 919.683-014, SVP-2, light.  *Id.* at 42-43.

The ALJ asked the vocational expert ("VE") to address two hypotheticals.  First, he asked the VE to assume a hypothetical individual the same age, education and work experience as the claimant who can perform medium work, occasionally lift/carry 50 pounds, 25 pounds frequently, sit/stand/walk six hours in an eight hour day, push/pull as much as he can lift/carry, limited to simple and detailed instructions, occasionally interact with the public, and asked if this individual could perform any of the past jobs P.C. has held.  The VE said yes, testifying that they could work in lube services and as a telephone directory distributor driver with reasoning level 2.  *Id.* at 43.

He testified further that such an individual could work as a Laboratory Equipment Cleaner, Landscape Specialist, and Hand Packager.  *Id.*

Next, the ALJ proposed another hypothetical, the same as the previous hypothetical but with a sit/stand option to alternate sit/stand as needed with the caveat that he would not be changing so frequently that he would be off task. He would not need to leave the workstation, he could occasionally climb ramps and stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, crawl, could he still do past work.  The VE testified that such an induvial could not perform P.C.'s past relevant work but could work as a Storage Facility Rental Clerk and Router. *Id.* at 43-44.

P.C.'s attorney then posed the following hypothetical: "If you were to take an individual with the same age and work experience as the claimant except that individual is limited to light work. Stand/walk six hours in an eight-hour day with 10-minute breaks every 30 minutes. Can not interact with the general public. Is only able to carry 20 pounds occasionally, 10 pounds frequently. Can he perform any of the past work?"  *Id.* at 44.  The VE testified that such an individual could not perform P.C.'s past relevant work because "anything beyond normally-scheduled breaks, is too much time on break" and that there would be no job such an individual could perform.  *Id.* at 44-45.  The VE testified further that for unskilled jobs, the maximum time a person can be off task is 10% and the maximum allowable number of absences is one day a month.  *Id.* at 45.

**F.    The ALJ's Decision**

At step one, the ALJ concluded that P.C. had engaged in substantial gainful activity in "at least" November 2019, as his earnings that month exceeded the level required to be considered substantial gainful activity of $1,220.00 per month.[9] *Id.* at 13.  However, the ALJ continued to

---

[9] In the heading of his discussion the ALJ wrote that P.C. "engaged in substantial gainful activity during the following periods: November 2019 through February 2020." *Id.* at 12.  In the discussion, however, he specifically addresses only November, even though he states that P.C. brought to the hearing his pay stubs for the period October 2019 through a portion of February 2020. *Id.* He does not explain the basis for his apparent conclusion that P.C. was substantially gainfully employed in the remaining months. *Id.* at 12-13.  The paystubs can be found at pages 181-212 of the AR.

18

step two, reasoning that "there [was] a period of greater than twelve months during the alleged disability period when the claimant was not engaged in substantial gainful activity." *Id.* He stated that the "remaining findings address[ed] the period(s) the claimant did not engage in substantial gainful activity." *Id.* At step two, the ALJ determined that P.C.'s peripheral neuropathy, diabetes mellitus, obesity, degenerative disc disease of the lumbar spine, anxiety disorder, and unspecified schizophrenia disorder constituted severe impairments, but his hypertension, chronic hepatitis B, substance use disorder, umbilical hernia, and chest pain and intermittent shortness of breath were not severe. *Id.* at 13–14. For each of the latter conditions, the ALJ provided an explanation as to why the condition was not "severe." *Id.*

At step three, the ALJ found that P.C.'s impairments, even in combination, did not meet or equal in severity any of the listed impairments, specifically considering Listings 1.04 (disorders of the spine), 11.14 (peripheral neuropathy), 12.03 (Schizophrenia spectrum and other psychotic disorders) and 12.06 (Anxiety and obsessive-compulsive disorders). *Id.* at 14. In support of his determination that P.C. did not meet Listing 1.04, the ALJ found that the record did not show an inability to ambulate effectively or perform fine and gross movements or compromise of a nerve root or the spinal cord, as required by Section 1.04. *Id.* Regarding Section 11.14, the ALJ found that the record did not show the disorganization of motor function in two extremities resulting in the extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities as required by 11.14A. *Id.* The ALJ further found that the record did not document a marked limitation in physical functioning and a marked limitation in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself as required by Section 11.14B. *Id.*

For the mental impairments, the ALJ addressed whether the paragraph B criteria of Section 12.03 and 12.06 were satisfied. *Id.* at 14–15. The ALJ found that P.C. had moderate limitations in three of the four functional categories of paragraph B, including his ability to interact with others, adapt or manage himself, and concentrate, persist, or maintain pace. *Id.* at 15. He found that P.C. had only a mild limitation in his ability to understand, remember, or apply information. *Id.* at 14.

19

The ALJ thus concluded that P.C. did not meet the paragraph B criteria because he did not have

two marked limitations or one extreme limitation in the functional categories.  *Id.* at 15.  The ALJ

further found that P.C. did not meet the paragraph C criteria.  *Id.* at 16.

At step four, the ALJ found that P.C. had the residual functional capacity ("RFC") to

perform:

> medium work . . . except he can lift and carry 50 pounds occasionally
> and 25 pounds frequently; he can stand and walk for six hours in an
> eight-hour workday; and he can sit for six hours in an eight-hour
> workday. He can push or pull as much as he can lift and carry. He is
> limited to simple and detailed instructions; and he could occasionally
> interact with the public.

*Id.*  In reaching this RFC, the ALJ found that P.C.'s medically determinable impairments could

reasonably cause the symptoms he alleged but that his "statements concerning the intensity,

persistence, and limiting effects of these symptoms are not entirely consistent with the medical

evidence and other evidence in the record."  *Id.* at 18.  In particular, the ALJ reasoned as follows:

> Although the claimant alleges significant limitations in his ability to
> lift, walk, stand, and climb stairs, he states that he is able to take care
> of his personal needs, perform household chores, shop, drive, and
> cook for himself on a daily basis (B5E; B9E; hearing testimony). He
> testified that he has been working for a temporary agency moving
> cars. Despite his physical impairments, there is little in the record to
> suggest any significant functional loss. Imaging of his lumbar spine
> has shown only stable, mild degenerative disc disease (B1F/64).
> Additionally, his physical examinations have been generally
> unremarkable; he has exhibited normal auscultation and respiratory
> effort; good air exchange bilaterally; no wheezing, rhonchi, or rales;
> regular heart rate and rhythm; normal S1 and S2; no murmurs,
> gallops, or rubs; intact sensory; intact motor; no edema; normal gait;
> good pulses in all extremities; and radial pulses 2+ bilaterally (B3F/6,
> 8, 20, 26, 43, 45, 49, 51, 55-57; B4F/5; B7F/5). The record notes in
> July 2018 that the claimant's neuropathy was stable on amitriptyline
> (B3F/22). The record notes that the claimant reported in August 2018
> that his blood glucose had been much better controlled medications
> and he denied any hypoglycemic or hyperglycemia episodes (B3F/1).
> The record indicated in May 2019 that he was routinely missing
> appointments (B4F/23). The record also notes that he has refused care
> and has had lapses in treatment (B3F/16; B4/2, 3, 6, 10, 12, 23). With
> respect to his mental impairments, his examination findings have also
> been generally unremarkable; he has been alert and oriented,
> cooperative, and in no acute distress; and he has exhibited normal
> memory, normal insight and judgment, and an appropriate mood and
> affect (B3F/6, 26, 43-45, 49-51, 55-57; B4F/4-5, 28). Thus, overall,
> the alleged intensity, persistence and limiting effects of the claimant's
> impairments are not consistent with the objective medical and other
> evidence.

United States District Court
Northern District of California

1   *Id.* at 19.

2        The ALJ then addressed the persuasiveness of the medical opinions in the record.  He

3   found that the opinions of the state agency medical consultants whose opinions concerning P.C.'s

4   physical limitations were based on reviews of the record, Drs. Herman and Pham, were persuasive

5   regarding the physical aspects of the RFC determination.  *Id.* The ALJ reasoned that the opinions

6   of Drs. Herman and Pham were "supported by medical evidence of record including examination

7   findings of normal gait, uncorrected vision of 20/25 bilaterally, no lower extremity edema, and

8   intact sensation." *Id.*  He stated further, "[t]he opinion is also generally consistent with the record

9   as a whole, including other examination findings of 5/5 strength, normal pulses, normal range of

10  motion, and intact motor; with the diagnostic imaging showing only mild degenerative disc

11  disease of the lumbar spine; with the claimant's treatment history."  *Id.*

12       The ALJ found only partially persuasive the opinions of the physical consultative

13  examiner, Dr. McMillan.  In particular, the ALJ found Dr. McMillan's RFC was "persuasive with

14  respect to the limitation to the medium exertional level, as this is supported by the doctor's

15  examination findings of normal sensation, normal straight leg raise, 5/5 strength, and normal

16  reflexes [and was]  generally consistent with the record as a whole, including other examination

17  findings of normal gait, no edema, and normal pulses; with the opinions of the state agency

18  medical consultants; and with the claimant's treatment history." *Id.* at 20.  On the other hand, he

19  found unpersuasive Dr. McMillan's opinion regarding P.C.'s postural limitations, concluding that

20  they were "not supported by the examination findings of normal range of motion in the lower

21  extremities and the overall evidence of record (including, but not limited to, P.C.'s ability work)."

22  *Id.*

23       The ALJ found that the form completed by Dr. Diaz had "no probative value because it

24  [was] not supported by objective evidence" and was "inconsistent with the record as a whole,

25  including examination findings of normal gait, 5/5 strength, normal grip strength, normal range of

26  motion, normal sensation, normal reflexes, and intact motor; with the diagnostic imaging showing

27  only mild degenerative disc disease of the lumbar spine; with the claimant's treatment history; and

28  with the opinion of the consultative examiner." *Id.* at 19. The ALJ also pointed to the fact that Dr.

Diaz provided only a "checklist-style form" that "include[d] only conclusions regarding functional limitations without any rationale for those conclusions." *Id.*

With respect to mental limitations, the ALJ found that the opinions of state agency psychological consultants Drs. Bilik and Ryan, which were based on reviews of the record, were persuasive as to P.C.'s limitations. *Id.* at 20. He found the opinions of the psychological consultative examiner, Dr. Gupta, "generally persuasive" but rejected her "opinion pertaining to [P.C's] ability to perform work activities on a consistent basis and maintain regular attendance and complete a normal workday/workweek" on the basis that it was "inconsistent with the claimant's testimony regarding his work activity." *Id.* at 20–21.

Subsequently, the ALJ determined that P.C. was able to perform his past relevant work as a Lube Servicer, and Telephone Directory Distributor Driver. *Id.* at 21. In addition to past relevant work, the ALJ, relying on the testimony of the VE, found that P.C. could perform a range of medium work, including as a Laboratory Equipment Cleaner, a Landscape Specialist, or a Hand Packager. *Id.* at 22. The ALJ thus found P.C. not disabled at steps four and five. *Id.* at 23.

## G.    Issues for Review

P.C. seeks reversal of the commissioner's denial of benefits for four reasons, arguing the following:

1. The ALJ erred in determining that P.C.'s statements concerning the intensity, persistence, and limiting effects of his symptoms were not consistent with the medical evidence.

2. The ALJ erred in in finding the opinions of Drs. Herman, Pham, and McMillan persuasive while finding the opinion of Dr. Diaz unpersuasive.

3. The ALJ erred in finding that P.C.'s schizophrenia disorder did not meet or equal Listing 12.03.

4. The ALJ erred in failing to find that P.C. suffers from severe hypertension and intellectual disorder.

## IV.    ANALYSIS

### A.  Standard of Review

District courts have jurisdiction to review the final decisions of the Commissioner and may

affirm, modify, or reverse the Commissioner's decisions with or without remanding for further

hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).   When reviewing the

Commissioner's decision, the Court takes as conclusive any findings of the Commissioner that are

free of legal error and supported by "substantial evidence."   Substantial evidence is "such

evidence as a reasonable mind might accept as adequate to support a conclusion" and that is based

on the entire record.  *Richardson v. Perales*, 402 U.S. 389, 401. (1971).  "'Substantial evidence'

means more than a mere scintilla," *id.*, but "less than preponderance."  *Desrosiers v. Sec'y of*

*Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (internal citation omitted).  Even if the

Commissioner's findings are supported by substantial evidence, the decision should be set aside if

proper legal standards were not applied when weighing the evidence.  *Benitez v. Califano*, 573

F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)).  In

reviewing the record, the Court must consider both the evidence that supports and the evidence

that detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir.

1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

### B.   Whether the ALJ Erred as to Credibility Findings

#### 1.   Legal Standards

In assessing a claimant's subjective testimony, an ALJ conducts a two-step analysis.

*Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017).  The ALJ must first determine "whether

the claimant has presented objective medical evidence of an underlying impairment 'which could

reasonably be expected to produce the pain or other symptoms alleged.'"  *Treichler v. Comm'r of*

*Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d

1028, 1036 (9th Cir. 2007)). If the claimant does so, and there is no affirmative evidence of

malingering, then the ALJ can reject the claimant's testimony as to the severity of the symptoms

"'only by offering specific, clear and convincing reasons for doing so.'"  *Tommasetti v. Astrue*,

533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen*, 80 F.3d at 1281).  These reasons must be

"sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit

claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).  "General findings

are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). "Factors that an ALJ may

United States District Court
Northern District of California

1   consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in

2   testimony or between testimony and conduct, daily activities, and 'unexplained, or inadequately

3   explained, failure to seek treatment or follow a prescribed course of treatment.'" *Orn v. Astrue*,

4   495 F.3d 625, 636 (9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

5              **2.  Discussion**

6        The ALJ found that "[P.C.]'s medically determinable impairments could reasonably be

7   expected to cause the alleged symptoms" without pointing to any affirmative evidence of

8   malingering.  AR 18.  Thus, the ALJ needed to provide "specific, clear and convincing reasons"

9   for rejecting P.C.'s testimony concerning the intensity, persistence, and limiting effects of his

10  symptoms.  *Tommasetti*, 533 F.3d at 1039.  The ALJ provided five reasons for declining to fully

11  credit P.C.'s testimony about the severity of his symptoms:  1) inconsistencies with P.C.'s

12  activities of daily living; 2) the fact that P.C. was working at a car auction at the time of the

13  hearing; 3) physical examinations and medical tests, which the ALJ characterized as

14  "unremarkable"; 4) P.C.'s treatment history, which the ALJ found revealed periods of better

15  control of his conditions, refusals of care, lapses in treatment, and routinely-missed appointments;

16  and 5) mental examinations findings that the ALJ found to be "generally unremarkable."  For the

17  reasons set forth below, the Court concludes that these reasons are not specific, clear and

18  convincing.

19              a.   Activities of Daily Living

20        Daily activities may justify discounting a claimant's symptom testimony where they show

21  that the claimant is more functional than they have alleged. *See Fair v. Bowen*, 885 F.2d 597, 603

22  (9th Cir. 1989).  The Ninth Circuit has cautioned, however, that "'the mere fact that a plaintiff has

23  carried on certain daily activities . . . does not in any way detract from [their] credibility as to

24  [their] overall disability.'" *Orn v. Astrue*, 495 F.3d at 639 (quoting *Vertigan v. Halter*, 260 F.3d

25  1044, 1050 (9th Cir. 2001)).  Inconsistencies between a claimant's symptom testimony and daily

26  activities justify discounting such testimony only if the daily activities establish that "a claimant is

27  able to spend a substantial part of [their] day engaged in pursuits involving the performance of

28  physical functions that are transferrable to a work setting." *Id.*  "The ALJ must make specific

United States District Court
Northern District of California

24

findings relating to the daily activities and their transferability." *Id.*  In addition, the Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014); *see also Smolen*, 80 F.3d at 1284 n.7 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits.").

Here, the ALJ cited P.C.'s ability to "take care of his personal needs, perform household chores, shop, drive, and cook for himself on a daily basis" to discredit P.C.'s testimony that he has "significant limitations in his ability to lift, walk, stand, and climb stairs."  AR at 18-19.  He did not, however, demonstrate any specific inconsistencies between P.C.'s allegations as to his limitations and his daily activities.  As an initial matter, the ALJ did not demonstrate that P.C. spends a substantial part of his day engaged in the listed activities.  *See Orn*, 495 F.3d at 639. Additionally, the ALJ did not explain how caring for his personal needs, performing household chores, shopping, driving, and cooking for himself daily involve the performance of physical functions that are transferrable to a work setting.  *See id.*

Moreover, P.C.'s descriptions of his daily activities are largely consistent with his allegations of how his physical impairments impact his ability to work.  For example, P.C. describes an average day in his Adult Function Reports dated October 25, 2018, as follows: "Wake up around noon or 1-2 PM.  Make my bed & take shower.  Eat if hungry or lay back down & watch T.V. or D.V.D. movies all day."  AR 243.  In that same report, when asked what he was able to do prior to the onset of his impairments, he responded "[g]o out in public & play sports. Run at will. Go to clubs and parties. Go to places where a lot of people would be."  *Id.*  Despite the ALJ's assertion that P.C. can "cook for himself on a daily basis," P.C's own statements indicate that he needed to "sit during certain sessions" and that if his chronic pain affected him too much, he ate fast food instead of cooking.  *Id.* at 244.  He also asserted that he only left his house two to four times per week because of "[c]hronic pain in feet & legs & major anxiety & panic attacks."  *Id.* at 245.  Moreover, P.C. stated that he went grocery shopping only "once a month or

twice" for "1 hour or 2" and he could only walk for a quarter mile or less before needing to rest because of the burning pain he experiences. *Id.* at 245, 247. Therefore, the ALJ erred to the extent he relied on P.C.'s activities of daily living to discredit his testimony about the severity of his symptoms.

### b.   Employment

The ALJ also cited P.C.'s testimony that he "ha[d] been working for a temporary agency moving cars" to discredit his symptom testimony. AR at 19. There is no doubt that a claimant's employment may be a specific, clear and convincing reason to discredit the claimant's allegations as to the severity of their symptoms. *See, e.g., Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (finding ALJ did not err in discrediting claimant's testimony about her functional limitations based, in part, on evidence that "she recently worked as a personal caregiver for two years, and has sought out other employment since then"); *Huizar v. Comm'r of Soc. Sec.*, 428 F. App'x 678, 680 (9th Cir. 2011) (finding that ALJ did not err in discrediting claimant's symptom testimony where she "had been working with her physical impairments full-time from 2000 until mid–2006."). Here, however, the ALJ did not explain how the specific demands of P.C.'s work driving cars at a car auction over a three-month period during which he testified he worked less than full-time discredits his symptom testimony. As discussed above, P.C. testified that he was mostly sitting and didn't have to lift anything when he performed his job at the car auction. Thus, his work there is not inconsistent with his testimony that he cannot walk more than 15-20 minutes without taking breaks due to pain in his lower back and legs or that he cannot lift 50 pounds occasionally and 25 pounds frequently. The Court therefore concludes that the ALJ erred in relying on P.C.'s work at the car auction to discredit his symptom testimony.

### c.   Physical Examinations

The ALJ also found that P.C.'s allegations of disability could not be squared with his "generally unremarkable" physical examinations, noting that there was "little in the record to suggest any significant functional loss." *Id.* at 19. The Court finds that the ALJ cherrypicked and mischaracterized the evidence in the record to reach this conclusion and therefore that this does not constitute a specific, clear, and convincing reasons for rejecting P.C.'s symptom testimony.

1  For example, the ALJ cited a radiology report from February 5, 2015, in which Dr. Sandra

2  Mun, M.D., found that an x-ray of P.C.'s lumbar spine revealed only "stable mild degenerative

3  disc disease at L5-S1." *Id.* at 19 (citing AR at 387). 387. However, the ALJ does not mention that

4  during this same time period P.C. sought treatment for severe lower back pain and pain in his leg

5  on several occasions, including at the emergency department, was referred to a pain specialist and

6  prescribed Norco, among other pain medications. *See* AR 392-394 (2/5/15 treatment note for

7  lower back and leg pain); 373-374 (2/11/15 treatment note for lower back and leg pain); 362

8  (2/11/15 emergency department treatment for lower back and leg pain); 367 (2/27/15 treatment

9  note for lower back and leg pain); 355 (3/27/15 treatment note for lower back and leg pain).

10  Further, the record shows that while P.C. was referred for x-rays to determine if there were

11  "degenerative causes" for his pain, AR at 394, his doctors also attributed his pain to his

12  neuropathy, a condition involving nerve damage, associated with his diabetes. Indeed, at least two

13  doctors concluded based on P.C.'s nerve conduction studies in 2014 and 2016 that P.C. likely

14  suffered from small fiber diabetic neuropathy. *Id.* at 330, 405-406, 413.

15  The ALJ's reliance on a July 3, 2018 note by N.P. Rowley stating that P.C.'s neuropathy

16  was "stable on amitriplyline [sic]"[10] also was incorrect as the ALJ plucked this language from a

17  description of P.C.'s symptoms that presented quite a different picture, with N.P. Rowley going on

18  to state: "Needs follow up w/neurology. Not alleviated by much. Worsened by walking,

19  standing. Currently throbbing and tingling sensation." AR 426. Moreover, in a treatment note

20  from August 21, 2018, just a little over one month later, Dr. Peterson described P.C.'s neuropathy

21  as "clinically worsening and debilitating." AR 405. Notably, the ALJ referred to this treatment

22  note as evidence that P.C. "reported in August 2018 that his blood glucose had been much better

23  controlled medications and he denied any hypoglycemic or hyperglycemia episodes[,]" AR 19,

24  without mentioning Dr. Peterson's observations about P.C.'s neuropathy.

25

26  _____

27  [10] The same treatment note reflects that P.C. was taking Nortriptyline for his neuropathy rather
than amitriptyline. AR 428. To the extent N.P. Rowley meant to state that P.C. was "stable" on
Nortriptyline, Dr. Peterson's note from a subsequent visit on August 21, 2018, undercuts that

28  conclusion, reporting that P.C. felt that "the Nortiptyline [was] no longer working" and that this
was "what [kept] him from being able to work." AR 405.

United States District Court
Northern District of California

1     Similarly, the "normal S1 and S2" finding cited by the ALJ occurred during an office visit

2     on July 27, 2018 in which Dr. Peterson also observed many more severe symptoms and

3     complaints, all of which were ignored by the ALJ.  These included notes that P.C. had experienced

4     "1 episode of [loss of consciousness] 1.5 weeks ago" and "worsening fatigue and malaise"; that he

5     had been to the emergency room for L-sided chest pain ten days prior; that he had been

6     "struggling with sugars at home"; that he was experiencing "worsening neuropathy in his feet, and

7     worsening blurred vision"; that he was "having increased episodes of dizziness/lightheadedness";

8     and that his hypertension was "not at goal." *Id.* at 412-413.

9     Likewise, the ALJ cited to findings of "regular heart rate and rhythm; normal S1 and S2;

10    no murmurs, gallops, or rubs," AR 19 (citing, *inter alia*, Ex. B4F/5 [AR 480]),[11] relying in part on

11    a treatment note from May 17, 2019, yet he neglects to mention that  those notes were made in

12    connection with a visit to the emergency department that same day for severe chest pains where

13    doctors found P.C. to be "high risk" and recommended that he be admitted for further testing.  *Id.*

14    at 483.

15    Finally, the ALJ cites to additional "unremarkable" findings from a May 10, 2018 visit to

16    Kaiser Permanente, where Dr. Malathi Acharya, M.D., found that P.C.'s respiratory and

17    cardiovascular symptoms were normal, and he had only mild edema.  *Id.* at 533.  Yet Dr. Acharya

18    in that visit did not modify P.C.'s diagnoses, continuing to diagnose him with diabetes mellitus

19    with peripheral neuropathy and hypertension (which was observed to be "not at goal"), among

20    other things, and prescribing the same dose of Nortriptyline for the neuropathy as was prescribed

21    by his treating physicians at Highland Hospital in 2018.  *Id.* She also put P.C. on

22    hydrochlorothiazide to alleviate his edema.  *Id.*  Taken together, then, the evidence that the ALJ

23    cited of "generally unremarkable" physical examinations does not provide a specific, clear, and

24    convincing reason for discounting P.C.'s testimony and allegations regarding the severity of his

25    physical symptoms.

26

27    ───────────────

28    [11]Because the ALJ referred to a long list of medical findings followed by a similarly long list of citations to evidence in the record, the Court is left to guess which evidence the ALJ relied on for each of the listed findings.

United States District Court
Northern District of California

d.   Conservative Treatment and Noncompliance

In support of his credibility finding, the ALJ pointed to evidence that "in May 2019  . . . [P.C.] was routinely missing appointments." *Id.* at 19 (citing B4F/23 [AR 499]).  He also stated, "[t]he record also notes that he has refused care and has had lapses in treatment." *Id.* (citing B3F/16 [AR 420]; B4F/2 [AR 478], 3 [AR 479], 6 [AR 482], 10 [AR 486], 12 [AR 488], 23 [AR 499]).  This is not a specific, clear and convincing reason for discrediting P.C.'s symptom testimony.

"Conservative medical treatment can only be used as the basis for discounting a claimant's testimony where the ALJ identifies the more aggressive treatment options that were available and appropriate and considers the reasons the claimant did not pursue more aggressive treatment." *Robert M. v. Saul*, No. 20-CV-03481-JSC, 2021 WL 2651363, at *5 (N.D. Cal. June 28, 2021) (citing *Lapeirre-Gutt v. Astrue*, 382 Fed. App'x 662, 664 (9th Cir. 2010)) ("[A]n ALJ errs in relying on conservative treatment if the record does not reflect that more aggressive treatment options are appropriate or available."); *see also Orn*, 495 F.3d at 638 (internal citations and quotation marks omitted) ("[A]n adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").

Here, the ALJ stated that P.C. was "routinely missing appointments in 2019," but the single citation to the record, AR 499, states only that P.C. was "routinely missing appointments" with "CCC."  It is not clear what type of appointments these were but in the context of the treatment note, it appears these were appointment to measure P.C.'s A1C level in connection with his diabetes mellitus, which the practitioner stated had last been measured in 2018.  *Id.*  At the same time, the treatment note stated that P.C. had been seen at the Wellness Clinic more recently, on February 5, 2019.  *Id.* Moreover, the ALJ points to no evidence that P.C. was missing appointments in 2018 and the treatment records discussed above indicate that P.C. was regularly seeking treatment at the time of his May 29, 2018 onset date.

United States District Court
Northern District of California

1     In addition, the ALJ did not explain why missing appointments in 2019 was an indication

2 that P.C. symptoms were less severe than he claimed in light of his statements in his Adult

3 Function Report that he sometimes needs reminders to go places and "forgets appointments"; that

4 he needs someone to accompany him when he is going to be near "large crowds"; and that he has

5 difficulty leaving the house due to his depression and anxiety.  *See id.* at 279-280. Indeed, it

6 appears the ALJ concluded P.C. did not need reminders to go places based on his responses on the

7 October 25, 2018 Adult Function Report, ignoring his response on the May 17, 2019 Adult

8 Function Report stating that he *did* need reminders.  *See id*. at 14, 246, 280.

9     Similarly, the ALJ's reliance on P.C.'s lapses in care and refusal of treatment is misplaced.

10 The ALJ cited to a treatment note from July 12, 2018 stating that P.C. had been in the week

11 before, on July 3, 2018, to "establish[ ] care and medications" after being out of care since 2016.

12 *Id.* at 420.  In other words, the lapse noted in that treatment note covered a period that was almost

13 entirely prior to P.C.'s May 29, 2018 onset date.  Further, the record reflects that P.C. saw Dr.

14 Acharya on May 10, 2018, had a telephone consultation with Dr. Acharya on June 4, 2018 and had

15 multiple appointments at Highland Wellness in the period that followed, as summarized above.

16     The ALJ also relies on evidence that P.C. refused admission to the hospital on May 17,

17 2019.  *See id.* at 478-479.  The record is clear, however, that whatever the reason for P.C.'s

18 decision, it does not reflect a lack of severity of P.C.'s symptoms given that he left the hospital

19 against the advice of his doctors, who saw him as high risk and wanted to admit him for inpatient

20 treatment and testing, as discussed above.  *Id.* at 488.

21         e.   Mental Status Examinations

22     Finally, the ALJ cited to P.C.'s "generally unremarkable" mental examination findings in

23 only partially crediting P.C.'s symptom testimony as to his mental limitations.  *Id.* at 19.  The ALJ

24 noted that in these examinations, P.C. has been "alert and oriented, cooperative, and in no acute

25 distress; and he has exhibited normal memory, normal insight and judgment, and an appropriate

26 mood and affect." *Id.* (citing B3F/6 [AR 410], 26 [AR 430], 43-45 [447-449], 49-51 [AR 453-

27 455], 55-57 [AR 459-461]; B4F/4-5 [AR 480-481], 28 [AR 504]). All of these treatment notes

28 were by practitioners who were treating P.C. for conditions other than his alleged mental

impairments, however, and none conducted any testing or evaluations of P.C.'s mental functioning.  Thus, these observations shed little light on whether P.C.'s allegations with respect to his mental functioning are credible.[12]

In sum, the Court concludes that the ALJ erred in discounting P.C.'s symptom testimony and that this error was prejudicial to the extent that the ALJ's RFC does not account for this symptom testimony. The Court further finds that because the RFC is not supported by substantial evidence, the Commissioner's finding of disability must be reversed.

### C.   Whether the ALJ Erred in Evaluating Medical Opinions

#### 1.   Legal Standards

For claims filed before March 27, 2017, "[t]he medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'"  *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)).  However, the regulations regarding the evaluation of medical evidence have been amended and several of the prior Social Security Rulings, including SSR 96-2p ("Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions"), have been rescinded for claims protectively filed after March 27, 2017, as is the case here.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017); *see also* 20 C.F.R. §§ 404.1520c (a), 416.920c(a).

The new regulations provide that the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion."  20 C.F.R. § 416.920c(a).  Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following factors: 1) supportability; 2) consistency; 3) relationship with the claimant; 4) specialization; and 5) "other factors."  20 C.F.R. § 416.920c(a)-(c).  "Although the regulations eliminate the 'physician hierarchy,' deference to

---

[12] The Court notes that the ALJ does *not* cite P.C.'s failure to seek mental health treatment as a basis for his credibility finding and therefore the Court need not address it here.

United States District Court
Northern District of California

1   specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still

2   'articulate how [they] considered the medical opinions' and 'how persuasive [they] find all of the

3   medical opinions.'"  *Christopher Charles A. v. Comm'r of Soc. Sec.*, No. C19-5914-MLP, 2020

4   WL 916181, at *2 (W.D. Wash. Feb. 26, 2020) (citing 20 C.F.R. §§ 404.1520c(a) and (b) (1),

5   416.920c(a) and (b) (1)); *see also Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

6           As with all other determinations made by the ALJ, the ALJ's explanation must be

7   supported by substantial evidence.  *See Woods, 32 F.4th* at 787 (holding that, under the new

8   regulations, "an ALJ's decision . . . must simply be supported by substantial evidence"); *Patricia*

9   *F. v. Saul*, No. C19-5590-MAT, 2020 WL 1812233, at *4 (W.D. Wash. Apr. 9, 2020) (citing 82

10  Fed. Reg. at 5852) (finding that, under the new regulations, "[t]he Court must . . . continue to

11  consider whether the ALJ's analysis has the support of substantial evidence"); *J.B. v. Kijakazi,* No.

12  20-cv-06231-VKD, 2022 WL 282513, at *3 (N.D. Cal. January 31, 2002).

13          The two "most important factors for determining the persuasiveness of medical opinions

14  are consistency and supportability," which are the "same factors" that "form[ed] the foundation of

15  the [prior] treating source rule."  Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.  The ALJ is

16  required to explicitly address supportability and consistency in their decision.  20 C.F.R. §

17  404.1520c(b)(2).  With respect to "supportability," the new regulations provide that "[t]he more

18  relevant the objective medical evidence and supporting explanations presented by a medical

19  source are to support his or her medical opinion(s) or prior administrative medical finding(s), the

20  more persuasive the medical opinions or prior administrative medical finding(s) will be."  20

21  C.F.R. § 416.920c(c)(1).  With respect to "consistency," the regulations provide that "[t]he more

22  consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence

23  from other medical sources and nonmedical sources in the claim, the more persuasive the medical

24  opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(2).

25          Typically, the ALJ "may, but [is] not required to," explain how they considered the

26  remaining three factors listed in the regulations.  *Id.*  However, where two or more distinct medical

27  opinions are equally supported and considered, the ALJ is required to articulate how they

28  considered factors other than supportability and consistency, including the treatment relationship.

United States District Court
Northern District of California

20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3); *see also Woods*, 32 F.4th at 792; *Ceja v. Comm'r of Soc. Sec.*, No. 1:20-CV-01267-EPG, 2021 WL 4690742, at *1 (E.D. Cal. Oct. 7, 2021).

The third factor, relationship with the claimant, is split into five sub-factors. 20 C.F.R. §§ 404.1520c(c)(3), 416.927c(c)(3). When analyzing the relationship with the claimant, the adjudicator should consider: (1) the length of the treatment relationship; (2) the frequency of examinations; (3) the purpose of the treatment relationship; (4) the extent of the treatment relationship; and (5) whether there was an examining relationship. *Id.*

Specialization, the fourth factor, suggests that a medical opinion is more persuasive if the source is a specialist in an area relevant to the claimant's conditions. 20 C.F.R. §§ 404.1520c(c)(4), 416.927c(c)(4). Finally, the catch-all provision, "other factors," permits adjudicators to consider "other factors that tend to support or contradict" a medical opinion. 20 C.F.R. §§ 404.1520c(c)(5); 416.927c(c)(5) (including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements.").

### 2. Discussion

As discussed above, the ALJ found that the opinions expressed by Dr. Diaz as to P.C.'s physical residual functional capacity had "no probative value[,]" instead finding persuasive the opinions of state agency doctors Herman and Pham and partially persuasive the opinions of consultative examiner Dr. McMillan. AR at 19. Plaintiff contends the ALJ erred in failing to give more weight to the opinions of Dr. Diaz than he gave to the state agency doctors. The Court agrees, at least as to certain physical limitations discussed below.

As a preliminary matter, the ALJ's statement that Dr. Diaz offered "no rationale" for his opinions is incorrect. Dr. Diaz indicated that the medical basis for many of the limitations noted in the form was "severe peripheral neuropathy." *Id.* at 402. This finding is supported by the record as a whole, which indicates that multiple doctors diagnosed P.C. with small fiber neuropathy in connection with his diabetes mellitus and that P.C. was consistently taking Nortriptyline for that condition, as discussed above. The record also contains numerous treatment notes reflecting that the pain associated with P.C.'s neuropathy was severe, at least intermittently,

1   and P.C.'s testimony regarding the associated functional limitations (which the ALJ erroneously

2   discounted, as discussed above) also supports Dr. Diaz's opinions.

3          With respect to consistency, the Court finds it significant that the postural limitations

4   adopted by Dr. Diaz are identical to those endorsed by Dr. McMillan after conducting a review of

5   P.C.'s medical records and a physical examination. In particular, both found that P.C. could climb,

6   balance, stoop, kneel, crouch or crawl no more than one third of the word day. Thus, the ALJ

7   erred to the extent he relied on "the opinions of the consultative examiner" to reject these

8   limitations. Nor did he explain how the other findings he cited ("normal gait, 5/5 strength, normal

9   grip strength, normal range of motion, normal sensation, normal reflexes, and intact motor; with

10  the diagnostic imaging showing only mild degenerative disc disease of the lumbar spine") were

11  inconsistent with these findings.

12         Further, to the extent that the ALJ found unpersuasive the opinions of Dr. McMillan as to

13  the postural limitations, the reasons he offered are not supported by substantial evidence. In

14  particular, the ALJ stated that these limitations were "not supported by the examination findings of

15  normal range of motion in the lower extremities and the overall evidence of record (including, but

16  not limited to, his ability work)." *Id.* at 20. There is no evidence in the record, however, that

17  P.C.'s work required him to climb, balance, stoop, kneel, crouch or crawl. Nor does the ALJ

18  explain why findings of normal range of motion are inconsistent with the postural limitations. In

19  addition, there appears to be no dispute that Dr. Diaz was a treating physician and Dr. McMillan's

20  opinions concerning P.C.'s postural limitations were based on a physical examination and review

21  of the records. In contrast, Drs. Herman and Pham conducted only a review of the record. There

22  also is no indication that any of the doctors' opinions should be given more or less weight on this

23  issue as a result of specialization or "other factors." Therefore, applying the five-factor test that

24  applies to weighing medical opinions under the new regulations, the Court finds that the ALJ

25  weighed the medical record incorrectly in concluding that the opinions of Drs. Herman and Pham

26  should be given greater weight than the opinions of Drs. Diaz and McMillan as to P.C.'s postural

27  limitations.

28         On the other hand, the remaining physical limitations in Dr. Diaz's form are inconsistent

United States District Court
Northern District of California

1   not only with the opinions of Drs. Herman and Pham but also Dr. McMillan. In particular, Drs.

2   McMillan, Herman and Pham all found that P.C. could lift and carry 50 pounds occasionally and

3   25 pounds frequently; he could stand and walk for at least six hours in an eight-hour workday; and

4   he would have no limitations with respect to sitting.  In contrast, Dr. Diaz found that P.C. could

5   lift and carry only 10 pounds frequently and occasionally; he could stand and walk for only two

6   hours in an eight-hour workday; and that while he could sit for six hours in an eight-hour

7   workday, he would need to alternate between sitting and standing.

8          While P.C.'s treatment records lend some support to the more restrictive functional

9   limitations endorsed by Dr. Diaz, the Court does not find evidence in the record that is particularly

10  probative of the *degree* to which P.C.'s neuropathy limits him with respect to how much he can

11  lift, how long he can stand or walk during the work day or whether he would need to alternate

12  between sitting and standing.  Under these circumstances, the persuasiveness of Dr. Diaz's

13  opinions may depend on whether he is more specialized than the other doctors, the nature of his

14  treatment relationship with P.C. or "other factors."  Unfortunately, however, the record is devoid

15  of any information about Dr. Diaz's field of specialization or his treatment relationship with P.C.;

16  nor is there any evidence one way or the other as to whether Dr. Diaz was familiar with P.C.'s

17  treatment history at Highland Hospital, as P.C. asserts in his motion papers. On this record,

18  therefore, the Court finds that as to the limitations in Dr. Diaz's form other than the postural

19  limitations, the ALJ did not err in giving greater weight to the opinions of Drs. Herman, Pham and

20  McMillan.

21      **D.     Whether the ALJ Erred in Finding P.C. Does not Meet Listing 12.03**

22          **1.  Legal Standards**

23          The Social Security Administration has supplemented the five-step general disability

24  evaluation process with regulations governing the evaluation of mental impairments at steps two

25  and three of the five-step process.  *See generally* 20 C.F.R. § 404.1520a.  First, the Commissioner

26  must determine whether the claimant has a medically determinable mental impairment.  20 C.F.R.

27  § 404.1520a(b)(1).  Next, the Commissioner must assess the degree of functional limitation

28  resulting from the claimant's mental impairment with respect to the following functional areas: 1)

United States District Court
Northern District of California

understand, remember, or apply information; 2) interact with others; 3) concentrate, persist, or maintain pace; and 4) adapt or manage oneself.  20 C.F.R. §§ 404.1520a(b)(2), (c)(3).  Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1.  20 C.F.R. § 404.1520a(d).  If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the evaluation proceeds to step four of the general disability inquiry.  *See* 20 C.F.R. § 404.1520a(d)(3).

Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the presence of various listed mental impairments, but all listed mental impairments share certain "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity criteria).  *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00.  Any medically determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more listed mental impairments—is sufficiently severe to render a claimant disabled if it also satisfies the general Paragraph B criteria, which requires that a claimant's mental disorder "result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning."  *Id.* at 12.00(A)(2)(b).  A claimant has a "marked" limitation if the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(d).  A claimant with an "extreme" limitation is "not able to function in this area independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(e).

This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above.  Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.").  If the Commissioner determines that the claimant has one or more severe mental impairments that neither meet nor are equal to any listing, the Commissioner must assess the claimant's residual functional capacity.  20 C.F.R. §

1   404.1520a(d)(3).

2   ### 2.   Discussion

3       The ALJ found that P.C. did not meet listing 12.03 because he did not satisfy the

4   paragraph B criteria, requiring one extreme limitation or two marked limitations in a broad area of

5   functioning, or the requirements of paragraph C.  AR at 14-15.  P.C. contends these findings are

6   not consistent with the evidence in the record, which reflects that his mental impairments are more

7   severe than the ALJ found them to be in the four areas of functioning discussed above.   Plaintiff's

8   Summary Judgment Motion at 8-10. He further asserts that Dr. Gupta's report documents P.C.'s

9   severe limitations with respect to her specific findings while at the same time reaching conclusions

10   with respect to the degree of limitation in four areas of functioning that are inconsistent with her

11   underlying findings; P.C. contends those conclusions "lack supportability" and should not be

12   given any significant weight in evaluating the paragraph B criteria. *Id.* at 9.

13       The ALJ's conclusion that P.C. did not meet Listing 12.03 is based on his findings that

14   P.C. was mildly limited in his ability to understand, remember or apply information; moderately

15   limited in his ability to interact with others;  moderately limited with respect to concentrating,

16   persisting or maintaining pace; and moderately limited in his ability to adapt or manage himself.

17   *Id*. at 14-15. These findings are consistent with the ultimate conclusions of Dr. Gupta, the

18   consultative examiner, with respect to the severity of P.C.'s mental limitations.  Although P.C.

19   argues the ALJ should not have relied on Dr. Gupta's conclusions because they are not supported

20   by her own underlying findings, the Court does not find the report to be internally inconsistent;

21   nor has P.C. pointed to any other evidence in the record from any medical source who found

22   P.C.'s mental limitations to be more severe.  Therefore, the Court concludes that the ALJ did not

23   err to the extent that he relied on the opinions of Dr. Gupta in assessing P.C.'s mental RFC.

24       Nonetheless, the Court finds that ALJ committed legal error at step three to the extent he

25   relied on P.C.'s own statements to support his conclusions with respect to the severity of P.C.'s

26   mental limitations while discrediting some of those statement for reasons that are not specific,

27   clear and convincing.   For example, in finding that P.C. had only a moderate limitation in

28   concentrating, persisting and maintaining pace, the ALJ acknowledged P.C.'s statements in his

United States District Court
Northern District of California

Adult Function Reports that "his ability to pay attention depends upon the subject and that he does not finish what he starts" but appears to have discredited those statement on the basis that "the record also notes a history of non-compliance with treatment, lapses in treatment history, and refusal of treatment." *Id.* at 15 (citing B3F/16 [AR 420]; B4F/2 [AR 478], 3 [AR 479], 6 [AR 482], 10 [AR 486], 12 [AR 488], 23 [AR 498]). The evidence cited by the ALJ, however, relates to P.C.'s missing appointments related to monitoring his diabetes and his decision to leave the hospital, against the advice of his doctors, when he was having chest pains.  As discussed above, the ALJ erred in relying on this evidence to discredit P.C.'s testimony about his physical limitations.  This error is even more glaring in the context of a mental RFC assessment as this evidence has no relevance whatsoever to P.C.'s limitations in concentrating, persisting and maintaining pace.

Because the ALJ's error in evaluating P.C.'s symptom testimony infected his assessment of P.C.'s mental RFC at step three, the ALJ's conclusion that P.C. did not meet Listing 12.03 is also legally flawed.

### E.     Whether the ALJ Erred in Finding that P.C.'s Hypertension and Intellectual Disability Are Not Severe

#### 1.   Legal Standards

"[T]he step two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153–54 (1987)). "A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, *i.e.*, do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities." Social Security Ruling ("SSR") 85–28. The omission of an impairment at step two can only be harmful if it prejudices the claimant in steps three through five. *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005).

#### 2.   Hypertension

The Court finds that the ALJ erred in finding that P.C.'s hypertension was non-severe under the lenient standard set forth above.  The ALJ found that P.C.'s hypertension was non-

severe because his "records indicate that this condition is generally stable with medication and that he was at goal."  AR at 13 (citing B3F/2 [AR 406], 16 [AR 420], 23 [AR 427]).  Yet one of the three treatment notes cited by the ALJ, at AR 406, does not support his conclusion, stating that P.C.'s hypertension was *not* at goal.  And while he pointed to two other treatment notes, from July 3, 2018 and July 12, 2018, stating P.C. was "at goal" on those days, he did not address the numerous other notes indicating that P.C.'s hypertension was poorly controlled and not at goal. *See* AR 356 (3/27/15, hypertension "still not at goal"), 363 (2/27/15, hypertension "not well controlled"), 406 (8/2/1/18, hypertension "not at goal"), 481 (4/17/19, hypertension "poorly controlled"), 533 (5/10/18, hypertension, "not at goal add hydrochlorothiazide which will help with pedal edema").

It is less clear whether the ALJ's finding that P.C.'s hypertension was non-severe resulted in prejudice.  P.C. contends he was prejudiced because the ALJ did not consider the chest pains he experienced in connection with his hypertension.  Plaintiff's Summary Judgment Motion at 11. He does not, however, explain how this symptom, which appears to have been limited to two brief periods approximately a year apart, limited his ability to work; nor does P.C. point to any specific limitations the ALJ should have considered in connection with his hypertension.

But there is also evidence in the record that P.C.'s hypertension caused not only chest pain but also pedal edema on at least one occasion. *See* AR 533.  To the extent this symptom could affect P.C.'s RFC, including his ability to stand and walk or his need to alternate between sitting and standing, the Court concludes that this evidence, in combination with the treatment notes reflecting that P.C. experienced severe chest pains on occasion, is sufficient to trigger the ALJ's duty to develop the record as to the possible impact of P.C.'s hypertension at step four. *See Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005) (holding that ALJ erred in finding hypertension non-severe where medical records showed claimant's attempts to have his hypertension treated sometimes resulted in complications and side-effects of medication).  Because the ALJ did not do so, P.C. was prejudiced by the ALJ's finding of non-severity as to his hypertension.

### 3.  Intellectual Disability

P.C. argues in his motion that the ALJ should have found that his low IQ established that

1    he had an intellectual impairment that was severe. Plaintiff's Summary Judgment Motion at 11.

2    The Court need not reach this question, however, as P.C. has not demonstrated that he was

3    prejudiced as a result of the ALJ's failure to make such a finding.  Contrary to P.C.'s assertion in

4    his motion that he was prejudiced by the ALJ's "minimization of these impairments at step 5[,]"

5    *id.*, the ALJ expressly addressed Dr. Gupta's findings as to P.C.'s intellectual functioning in

6    formulating P.C.'s RFC, limiting him to simple and detailed instructions.  AR 20-21.  Thus, any

7    error the ALJ may have committed by failing to find a severe impairment based on P.C.'s low IQ

8    was harmless.

9        **F.    Remedy**

10       "A district court may affirm, modify, or reverse a decision by the Commissioner 'with or

11   without remanding the cause for a rehearing.'"  *Garrison v. Colvin*, 759 F.3d at 1019 (quoting 42

12   U.S.C. § 405(g)) (emphasis omitted).  "If additional proceedings can remedy defects in the

13   original administrative proceeding, a social security case should be remanded." *Lewin v.*

14   *Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).  On the other hand, the court may remand for award

15   of benefits under the "credit as true" rule where: (1) "the ALJ failed to provide legally sufficient

16   reasons for rejecting evidence, whether claimant testimony or medical opinion"; (2) "there are [no]

17   outstanding issues that must be resolved before a disability determination can be made" and

18   "further administrative proceedings would [not] be useful"; and (3) "on the record taken as a

19   whole, there is no doubt as to disability."  *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017)

20   (citations and internal quotation marks omitted); *see also Garrison*, 759 F.3d at 1021 (holding that

21   a district court abused its discretion in declining to apply the "credit as true" rule to an appropriate

22   case).  The "credit-as-true" rule does not apply "when the record as a whole creates serious doubt

23   as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act,"

24   *Garrison v. Colvin*, 759 F.3d at 1021, or when "there is a need to resolve conflicts and

25   ambiguities."  *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014).

26       Here, the Court finds that the record requires further development and therefore it is

27   appropriate to remand to the Commissioner for further proceedings.  Among other things, the

28   record needs to be developed as to the basis for Dr. Diaz's opinions with respect to P.C.'s

United States District Court
Northern District of California

functional limitations.  Although it appears to be undisputed that Dr. Diaz was a treating physician, his treatment relationship with P.C. is not apparent from the record and the basis for his opinions as to P.C.'s physical limitations is not stated other than his bare statement of P.C.'s neuropathy diagnosis. The Commissioner should attempt to obtain this information on remand.  In addition, it may be appropriate to seek the opinions of doctors who treated P.C. on numerous occasions, such as Dr. Peterson, to determine the nature and extent of P.C.'s physical limitations.

The ALJ should also develop the record as to whether and how P.C.'s hypertension may limit his ability to work and as to his mental impairments.  With respect to the latter, P.C. testified at the hearing that he had started receiving mental health treatment and his counsel also stated that P.C. had started treatment just a few weeks before.  To the extent that records of this treatment are available, the Commissioner should attempt to obtain them.  If P.C. has not undergone mental health treatment or the records are not available, it may be appropriate for the Commissioner to seek testimony from a medical expert about P.C.'s mental limitations.

## V.    CONCLUSION

For the reasons discussed above, P.C.'s motion is GRANTED, the Commissioner's motion is DENIED, and the Commissioner's decision finding that P.C. is not disabled is REVERSED. The Court REMANDS for further proceedings.  The Clerk is instructed to enter judgment accordingly and to close the file.

**IT IS SO ORDERED.**

Dated:  September 8, 2022

_____
JOSEPH C. SPERO
Chief Magistrate Judge